Smelter v. Southern Home Care Services Smelter v. Southern Home Care Services Ms. Smelter, who testified that she heard racial slurs and racial jokes on a daily basis that culminated in use of the term nigger, that she reported that racial harassment the day she heard the term nigger, and she was terminated that day, that as a matter of law, in light of those facts, she neither has a racial discrimination claim or retaliation claim. I submit to you... Has the decision been already made to terminate her? Your Honor, you've hit the nail on the head as to the problem we've had conveying the timeline. And I think the district court actually found contrary findings on that. And let me explain to you, let me give you the timing first, and then I'll explain the contrary findings. It'll be helpful to know, most of all, what the record says about that. Yes, sir. Will do. And then, you know, what the district court did too is important, but what really matters, since it's de novo review, is what the record says. Yes, sir. The record indicates this, and it does so both in Ms. Smelter's deposition and in Ms. Talton's deposition, and we've cited to that in our brief. But it starts with Ms. Smallwood and Ms. Smelter have an argument in the office. That's the first thing that happens on September 9th that dictates this case. Ms. Smelter says she called her a nigger, Ms. Smallwood says she didn't. Then Ms. Smelter calls Ms. Talton, the supervisor of the office. That's not in dispute. The part that is in dispute is that Ms. Smelter says, I reported the harassment in that call. Ms. Talton says she did not. The next thing that happens is that Ms. Talton calls Ms. Raleigh and Ms. Smallwood, both of the white ladies in the office. The next part, the next conversation is, Ms. Talton remembered that Ms. Smelter called her back. Ms. Smelter didn't testify to that, but Ms. Talton did remember that Ms. Smelter called her yet again to explain her side of the story one more time. Then we know this. This is undisputed. Ms. Talton calls Ms. McDougall, who is like the district manager. Ms. McDougall then calls HR. Ms. McDougall then calls Ms. Talton back to tell her to fire Ms. Smelter. Then Ms. Talton meets with Ms. Smelter in the office and tells her she's being fired because she's not a good fit. Most of those facts are not in dispute, except that when did Ms. Smelter tell Ms. Talton about the harassment? Ms. Smelter has presented and been very clear in her testimony, I told her when I called her. She was out in the field. I called her and told her about what happened, and I reported the racial harassment. The only issue is, it's not which conversation took place, it's what was said in the conversation. Well, is part of the, help me with this. Yes, sir. Is there any evidence that the decision-maker knows about this complaint of racial harassment? Well, Your Honor, to the extent that Ms. McDougall is the sole decision-maker, I would argue that you can infer knowledge based on circumstantial evidence that temporal proximity is a huge piece of evidence in that regard since this all took place in one day. But I don't even really have to go that far, because one of the primary theme of our case and what I would present to a jury, this is a classic cat's paw analysis. I mean, here's the scene. These racial slurs are being said in front of Ms. Talton. There's testimony on the record that she heard it and laughed about it. Ms. Smelter, when she's finally broken, being called nigger, she calls Ms. Talton and tells Ms. Talton about the racial harassment. So Ms. Talton knew about it because she'd already heard it. She's hearing a report about it from Ms. Smelter. She then calls Ms. McDougall and tells McDougall, McDougall testified to this, that Ms. Talton told her that Smelter, in fact, started the argument. But that's not the testimony on the record. Smelter certainly didn't say she started the argument, and Ms. Raleigh testified they were sort of bickering at each other. When Ms. Talton speaks to Ms. McDougall, she doesn't report the harassment. She just says Smelter started the argument. But we need to go back to Judge Pryor's question, was what is the evidence that the decision-maker, McDougall, knew about the report by Ms. Smelter? And here you have, as you said, you have the chronology, that Talton talked to McDougall before McDougall said fire her, but we know nothing about the content of that conversation. In our Clover case, we said that there's a difference between evidence that the decision-maker could have learned or could have known and evidence that the decision-maker actually knew. So how do you answer that problem? Well, I answer it that a jury could certainly infer from the very close temporal proximity that McDougall did, in fact, have knowledge. But, Your Honors, I could also present to a jury that Talton had the knowledge and contaminated the process. That kind of temporal proximity is what we, if there is knowledge, right, and then the adverse event occurs, we've said there can be that kind of inference that one caused the other. I don't know where we've ever said, though, that the fact that the adverse event occurred soon thereafter meant that there was a reasonable inference of the knowledge. Have we ever said that? And what makes that a reasonable inference? Well, to the extent that temporal proximity is so close, I think a jury could infer from a conversation that takes place in the same day and the swift sort of adverse employment action that follows this result. The problem is that we have to be concerned about is that in that event, anyone who wants to complain on the day of their firing of something for the first time, even though the firing decision may have been made by someone with no knowledge of the complaint, will automatically have a claim of discrimination. You see? I do see that. I do see that, Your Honor. But that's not the facts here because we do have this sort of classic cat's paw problem because Talton, who's the supervisor in the office, absolutely knows of the racial harassment and doesn't report it to McDougall. Instead, she says a different strain of facts than Smelter has relayed to her. Oh, you say that, and I did read portions of the plaintiff's deposition, and she does say that Talton laughed when some of this was mentioned. Yes, sir. At another place, though, the plaintiff says when the lawyer is going carefully over all of these prior, before the bad one on the last day, and plaintiff clearly testifies that nobody else heard it and that nobody else included Talton. It was just Smallwood and just Raleigh and her. And Talton wasn't even in the office most of the time, she said. I agree, Your Honor, that there's no evidence in the record that Talton heard Ms. Smallwood use the term nigger. I'm sorry. The earlier, all of the previous stuff. At that point, I believe it was 194 in the deposition. At that point, they were talking about everything that she's complaining about except the dumb black nigger. And she said nobody else heard it except Smallwood and Raleigh. I do know that. Is that right? Am I not right? Your Honor, I don't remember that specific page number, and I apologize. Part of the testimony that I do recall is that she said that those racial slurs were said in front of Talton and Talton laughed. And I don't know that she— The only way I could harmonize those was to think that Talton may have heard about it later, secondhand, and laughed it off. That's the only way I could reconcile if you try to reconcile. And, of course, if it's a conflict, we might have to take the plaintiff's version of it. But it's pretty weak evidence, and especially in light of the clear testimony that neither Talton nor McDougall were racist or made any decisions with respect to plaintiffs for racial reasons, which is interesting because it seemed to me you conceded that in your briefing, and then you argued what amounts to a very nuanced argument, I think, that even these two people who might have been decision-makers, Talton being the cat's paw, even though they had no racial motivations themselves, they acted in a way knowing that these racial things had occurred to punish plaintiff rather than correct the racial problems of Smallwood and Raleigh. That is your theory on appeal. And the district court didn't mention that argument. In fact, the district court held on the discrimination claim that plaintiff's deposition simply conceded it, which makes me wonder whether you didn't even make this nuanced argument to the district court, but came up with it because it was clear that there was this kind of concession of no racial motivation, and you made it for the first time on appeal. No, Your Honor. You think you made the nuanced argument in your briefing to the district court? Yes, Your Honor, I believe I did. Okay, we'll look at that. But even if you did, it seems to me that there's virtually no evidence to support it because you've got two potential decision-makers, neither of whom had racial motivations, neither of whom knew much. The most Talton might have known is whatever plaintiff could have told her on the telephone that very day. And it's pretty clear to me that even the totality of what plaintiff gathers together in her briefing for us falls way short of hostile environment because there's no evidence that her work performance was adversely affected. So that in order to prevail on your nuanced argument, you'd have to show that there was a whole lot said, not just a little bit in that telephone conversation, that that was repeated by Talton to McDougal, and that they knew so much about the racial harassment that all of the legitimate reasons for firing plaintiff, which were ample, were explained by how hard it is for any African-American person to work with these two women, Smallwood and Raleigh, which seems to me to be just not enough evidence to possibly get to a jury. I'm sorry it took me so long to say that, but I'd like to hear what you have to say. You've got two minutes to respond to that. I will do my best. There's a lot to unpack there. With all due respect, I disagree. The court didn't even reach the analysis of pervasiveness under the hostile work environment claim. And our client, my client testified very clearly that she heard these things on a daily basis. That in and of itself is pervasive. It's not as severe and pervasive. It's just pervasive, which should get us past the hostile work environment claim. Assuming that you weigh the four factors equally, the frequency, severity, physically threatening, and failure to perform your job. It seems as though you highlighted that, Judge. I want to talk about that for a moment. At the end of the day, at a bare minimum, being called nigger and getting in an argument over it absolutely affected her performance because they got her terminated. But having said that, they say she had trouble performing. And I can just imagine being in an environment where you're hearing racial jokes and racial slurs every day might actually affect your performance. Not clear to me, though, the employer knew that. The testimony in the record, as you pointed out, maybe there's a conflict even in the plaintiff's own testimony, Your Honor. But there is testimony in the record that Tolton would hear the jokes and just laughed at it. And that when she called her to tell her that she'd gotten in this argument and been called nigger, that she reported the racial harassment. Now, the closer question to me, and I hear what you're saying. The reporting is the day that she's terminated. Before she's terminated, yes, Your Honor. Before she's terminated. But not to the person who makes the decision. But that's where the cat's paw analysis come in. And that's where Staub v. Proctor comes in. You have a supervisor who has set in motion by failing to admit and then concealing a report to the decision maker. And under Staub, that is sufficient under Title VII to create a liability on the part of the defendant. And Judge, it is a nuanced argument. I hear you, it is nuanced. But life is nuanced. And when you're in a for-profit company and you've got two long-standing white older employees who think it's okay to make these jokes and think it's okay to use these terms, you are absolutely, as a business person, going to think to yourself, I'm not letting go of my experienced personnel in this office. The fact that the gal is black is causing a problem for my older white employees, I'm going to let the new black lady go. That seems, that's our theory. And I think we did play that out at summary judgment and in our appellate briefing. Okay. Thank you, Ms. Atwood. Mr. Bean. Good morning, Your Honors. Brent Bean on behalf of Southern Home Care. Thank you for hearing me today. Was that nuanced argument presented to the district court? No, it wasn't, Your Honor. She argued that under Ross, that the plaintiff hadn't unequivocally admitted that there wasn't any discrimination. Racial. That it was caveated somehow under the Rhodes case, which it wasn't. But the, you know, Your Honors got it exactly right. I want to read what the plaintiff said in deposition. So as you sit here today, you're not aware of anybody else, anybody else that can testify that they heard Catherine or Connie, that's Raleigh or Smallwood, make any race-related remarks either generally or to you. Answer, not to my knowledge. Page 194. And she goes on to say, quote, Brandy was never there to see any of the stuff that she was doing. She being Smallwood. Page 233 for deposition. The reason this nuanced argument has to happen, because she has to thread the needle around all the admissions that her client has made in deposition. And she's admitted in her reply brief that Talton, clear that Smelter did not believe Talton was acting with racial animus when terminating her. It's in her reply brief. So what you have here is not a cat's paw. You got a cat's knuckle. Smallwood, that's it. It doesn't go on to Talton. It doesn't go on to the decision-maker, McDougal. There's no evidence whatsoever that McDougal knew anything about this. Right? And in fact, if there's an inference to be drawn here, the inference is the same actor inference. McDougal's the one that hired her just two months before. The same African-American person two months before hired her, hoping she'd do a good job. The same African-American person that wasn't doing a good job based on her fraudulent resume. She wasn't qualified. And so they sent training down to her. We want to help you. We want to help you do the job we hired you for. And it didn't happen. And she got into quarrels and she got disciplined. And that's not controverted. She signed the disciplinary paper. You know, Ms. Atwood doesn't say anything about that. She talks about pretexts and things that may have happened. It's a theory in search of facts. There's nothing in the record that says Ms. Smelter wasn't disciplined. She was. So, that's in response to what Ms. Atwood said just now. What we're looking at here today, as your honors well know, is three claims. One for race discrimination. We fired this Atwill employee because she's black. That's what they're saying. Then for a hostile work environment that we knew and permitted a severe or pervasive race hostile work environment. And that we retaliated against Ms. Smelter when she, at the 11th and a half hour, allegedly reported that these things were happening. But her admissions got all this. As I noted in my brief, she admitted that neither of the decision makers, and I would say McDougall's the decision maker, but if you would credit that Talton could be, neither of them acted with racial animus in terminating her employment. Well, that's not exactly what she said. She said she didn't think either of them were racist. Okay, she said both. She said the static condition that they're not racist. And I will credit you that a racist can act non-racially and vice versa. Could also act racially. A non-racist could still act with racial motivation. You agree with that? Absolutely. But she also said, did I think Brandy was being racial when she fired me? Not a static condition, a dynamic condition. Was she acting racially when she fired me? What does that mean? I don't know, but I'm not sure it's clear that she's saying she didn't act in a discriminatory manner. Okay, so the standard under Ross is if a plaintiff unequivocally admits that race was not the motivating factor or was not related to their adverse employment action, then they've waived their claim. I agree with you, but I'm just not sure that's what we have here. Well, I don't know how it could be anything else. I don't think there's magic words that are required. I think those words mean just that. She wasn't acting racially when she fired her. And if there's something else it means, I'm all ears, but I don't know what else it could possibly mean. And besides, I think it's been conceded in the reply brief. And we've gotten onto this nuanced argument. But there's no evidence for this nuanced argument that Smallwood's alleged animus was conveyed to Talton. I mean, that's what the Staub case says. There has to be some recommendation by the person with animus to the decision maker, right? There's no evidence of that. I mean, to the contrary. Again, the plaintiff says Talton didn't have any animus. And certainly McDougall didn't. Now, with respect to the hostile working environment, Judge Abrams . . . Before you get to that, her evidence about Talton, T-A-L-T-O-N, is that the one line that's inconsistent with that later testimony at 194, that one line that said that Talton laughed. So that's . . . That is her evidence of Talton also knowing about everything. Well, yes. So they take one instance of a very vague piece of testimony that she laughed about something racial. Or racial profiling or something like that. There's no facts. I mean, on the one hand, we have all of these direct quotations at the plaintiff's sites, right, for effect, about people in chains and monkeys and all that. I mean, they're in quotes. But with respect to this critical piece of evidence, right, that might get her around her pretty clear admissions, it's very vague, right? And what do we hear about that? That she laughed one time. So that doesn't mean she's aware of severe or pervasive harassment that's ongoing. And it's not really clear what it means to begin with. I mean, I will grant you that it seems logically inconsistent with the clear admission that Brandy was never there, didn't know anything about it, never heard anything, and then this one laughing part. But I don't think that one instance and the vague testimony about it gets her around to a question of fact as to whether Talton knew that there was a hostile work environment. I mean, it has to be more than just one time, does it not? So Judge Abrams saw through this and she decided that there was not enough evidence of severity or pervasiveness under Mendoza. So what we have here is a conclusory allegation by the plaintiff. This happened every day. Of course, they all say that. And if that's what gets you to a jury, then I think that's wrong. It might get you on pervasiveness. It doesn't mean that you have a hostile work environment claim because the employer has to be aware of it, right? Well, that's correct. That's the second part that Judge Abrams decided. I'm not sure I'm in agreement with Judge Abrams about that. Well, let's talk about what it's required to find employer liability because that's all that really matters here, right? That is what matters. And so there is no, I mean, she's admitted again that she never reported it until the 11th hour to the very end when the conduct had already occurred, when she was already going to be fired. This isn't already been made. Never reported it. So you have to have evidence that there was either actual knowledge on behalf of the employer or constructive knowledge. Knew or should have known. If she had reported it, they would have known. Didn't. Talton, never there. Never witnessed it. Never saw it. No evidence that she knew of a hostile work environment and permitted it to exist. It's just not there. So I think she loses on proving, I mean, her testimony alone on page 194 takes her out on a hostile work environment claim to establish employer liability. Seems to me what we would have to assume for plaintiff to prevail is that plaintiff, number one, talked to Talton before Talton talked to McDougal. In that telephone conversation, plaintiff would have had to have conveyed to Talton enough of the past racial stuff, plus the last one on that bad day, to convey to Talton that there had, in fact, been a hostile environment, which was so hostile that it explained all of the work problems that the plaintiff was having. If all of that were conveyed to Talton and then we infer that that was conveyed to McDougal, then you might have a problem under this nuanced argument. A lot of ifs there and a lot of stuff that's not in the record. That's why I said in the beginning this is a theory in search of facts. Here's another one. She admitted on page 194, before the passage that you remembered, this was taking place when nobody was in the office. We can quibble with Judge Abrams' order on pervasiveness or severity under the Mendoza factors. I think she got it right. But you have to agree that there's no basis for employer liability here to find a hostile work environment. With respect to the retaliation, again, you've got to draw a lot of inferences and find facts that don't exist in the record to sustain her claim or to overturn what Judge Abrams found. You've got to find that despite the admitted history of disciplinary actions, there's no question about that. It's not in dispute that it was the but-for cause, her reporting, not anything else, just her reporting that day, her opposition activity was the but-for cause of her termination. You have to find that. And there's no evidence that McDougal even knew about it. The only inference here that Plaintiff has, and she said it two or three times just a minute ago, is temporal proximity. This circuit's jurisprudence says you can't go in and try and save your job, right? That's a causation issue. That's not, as I understand it, a knowledge issue, right? Well, I think Judge Abrams got the causation part wrong, to be candid with you. She found the prima facie case based solely on temporal proximity. Regardless, I mean, but this temporal proximity issue is never something that speaks to knowledge. Never said that that means, the fact that you were fired means that it allows for a reasonable inference of knowledge. It only allows, you have to prove that there was the knowledge and the temporally proximate adverse action. That gets you to causation, an inference of causation, not to an inference of, you can't bootstrap it to create an inference of knowledge, it seems to me. Well, I will tell you, as I read Alvarez, that what this court has said is that the anti-retaliation provisions of Title VII don't allow employees who are already on thin ice, who have significant prior disciplinary history, to insulate themselves. Yeah, that all may be true, Mr. Bean. You understand the argument that your adversary, the opposing counsel made this morning is that it allows for an inference of knowledge, because she's got a problem there. And I'm just saying, I don't think that's ever happened, right, in the case law. There's no recognition of that. Okay. Let's just finish up on what Judge Abrams did find, and I see I'm running, so let's just, let's get to that. She found there was a prima facie case. Fine. I think we know what she found because we can read that, and I've got this question, and your time's running out. Is it, do we know one way or the other, or is there a reasonable inference that Tarleton called McDougall after she talked to plaintiff? And after plaintiff allegedly Told her all of this. Disposed the parade of horribles? I told her all of this. No, there's not. Why? Tell me why. Because Tarleton testified that way. She put it in her declaration. She got an email from Raleigh saying there's something going on in the office, and she talked to Raleigh, and then she called McDougall. And then, I think she called, she said she called back and talked to plaintiff and Smallwood about what in the devil's going on. And when she talked to McDougall the first time, is that when McDougall said that's the last straw? That's correct. What does plaintiff say that throws any doubt on that timing? Nothing that I'm aware of. She wasn't even, in fact, she testified in her deposition, she wasn't even aware, and how could she be, that Tarleton had talked to Raleigh first. Right? I mean, she thought that when Tarleton talked to her, that was the initial instance, but it wasn't. And the record's very clear. It was an email and a phone call to Raleigh, then McDougall. And I'm not really sure the timing is that critical in terms of finding a pretext. The timing is, if the last straw occurred before plaintiff even talked to Tarleton, that ends plaintiff's case. Mr. Bean, thank you. Thank you very much. I appreciate your time. I would urge the Court to affirm Judge Abrams' decision. Ms. Atwood, you've saved five minutes. I have. I will try to give you some time back, I promise. I did argue Katz's fall, and I did so at summary judgment on pages 12 and 13. It has been the theory of the case. It did not show up at the appeal. That's not the nuanced argument I was talking about. The one that, your nuanced argument was that these ladies themselves, the decision makers, didn't actually harbor a racial animus. Instead, they acted on a racial motivation because of the racial animus of their employees. Is that, will we find that in your briefs to the District Court? Yes, you will, on pages 12 and 13. All right. Let's be sure we have a real clear understanding of the testimony here because I think Mr. Bean just doesn't. In Ms. Tarleton's deposition, I go through this day with her and how she hears and who she talks to and her testimony on pages, and this spans from pages 78 through about 85 of her testimony. I'm not going to read all that to you, but I just want to point out on 78, it starts that Connie had called her. I don't know if they were both yelling, and then she says, I asked to speak to Brenda. And she stated that Catherine and her had had a disagreement, so she talks to Brenda. Then she goes on to say, I talked to Catherine as well. That's Ms. Smallwood. So then she talks to Ms. Smallwood, gets Ms. Smallwood's version of the events. Then she says, Brenda called me after that, after I talked to them. So Brenda calls her again. Brenda is Tarleton. Forgive me, I'm so sorry. Ms. Smelter talks to her first. Then she asked to speak to Ms. Smallwood. So she talks to Ms. Smallwood. Then she talks to Ms. Smelter again. Then she calls McDougal and told her what was going on in the office. Your Honors, there really is no dispute that Brenda speaks with Ms. Tarleton before Ms. Tarleton talks to Ms. McDougal. The dispute is, and this is where you have to weigh in favor of Ms. Smelter. The dispute is that Ms. Smelter told her everything that went on right after she's called a nigger. Whereas Ms. Tarleton just doesn't remember any of that. We'll look at that deposition. Your Honor, I would point out one thing to you. And he's right. The district court did find causation in the retaliation claim and we of course agree with her on that. The strange part is, for purposes of the hostile work environment claim, her finding on the notice part of that hostile work environment claim seemed contrary to the finding of causation on the retaliation claim. She gives us causation based on temporal proximity or retaliation. But then she says under the hostile work environment claim that the defendant lacked notice. Well, that gets to what my concern has been all along. Yes, sir. Those are two different things. Well, unless Ms. Tarleton, and this is the testimony on the record, even if Ms. Smelter sort of conflicts herself in her own deposition, we do have the evidence that she heard it and laughed. But the evidence on this is not in conflict, that when she gets on the phone with her, before she talks to Ms. McDougall, she tells her everything that went on. And everything that went on, that phrase in her deposition, is after she describes this whole argument where she's been called a nigger. So, there is notice. I will grant you it's right before her termination. But there is notice, even if you don't agree that Ms. Tarleton actually heard these comments and was aware of them. I have notice as of that date. Not clear to me that Ms. McDougall has it. And, Your Honor, under a classic cat's paw analysis, which this Court has sanctioned and agreed to exist, that she doesn't have to. And there are cases that say knowledge can be inferred through circumstantial evidence. Goldsmith v. City of Atmore, Weaver v. Casa, I can't speak Spanish, Yarday, something. And I didn't brief those because this did not come up. I don't doubt that knowledge can be inferred through circumstantial evidence. I don't think there's a case that says knowledge can be inferred by temporal proximity. Well, temporal proximity as circumstantial evidence, in theory, could get you to the point that you infer knowledge, especially in this situation, Your Honor, where we're talking about such a close point in time. But again, Your Honor, we don't have to get there. I could try to prove that at trial in front of a jury, but I could infer from Talton's own actions or inactions and failure to reveal to Ms. McDougall what she had just been told, that she, in fact, set this termination into motion. You promised to return some time, Melissa. I give you 10 seconds back, Your Honor. Fulfill your promise. Thank you. We are in recess. We are adjourned for the week. All rise. Thank you.